Ben **HENSON**, Appellant,

v.

**COMMONWEALTH** of Kentucky, Appellee.

Court of Appeals of Kentucky.

Oct. 24, 1958.

Ollie James Cockrell, Jackson, for appellant.

Jo M. Ferguson, Atty. Gen., David B. Sebree, Asst. Atty. Gen., for appellee.

STEWART, Judge.

Ben Henson was found guilty of the crime of voluntary manslaughter and sentenced to serve twenty-one years in prison. He appeals, urging these grounds for reversal: (1) The verdict of the jury was against the law and the evidence; and (2) the lower court admitted incompetent evidence of a prejudicial nature, to which Henson at the time objected and excepted.

The Commonwealth's chief witness, Alpha Bush, the daughter of the deceased, Abbie (Red) Bush, established these facts in connection with the killing: In the early afternoon of June 25, 1957, a mule owned by Hazel Henson, the mother of appellant, had strayed from her home and had invaded a soybean patch of Samantha Bush, the ex-wife of the deceased. Abbie Bush was, prior to his death, residing as a boarder with Miles White and his wife, Ruby, whose residence was across a small creek from the soybean patch. Abbie Bush arrived at the White household from his work about the time Hazel Henson and her son, Martin T. Henson, a younger brother of appellant, came up the road to retrieve the mule.

According to his daughter, Alpha Bush, her father, incensed by the incident, remarked in the presence of Hazel Henson and her son: "If it was me I'd go in and get a gun and kill that mule." This statement produced some inflammatory words on the part of Hazel Henson and Martin T. Henson and the latter spoke up, saying that he would go home and get his gun. Whereupon he departed. Abbie Bush, probably anticipating trouble with young Henson, promptly left the White residence, went across the creek and the soybean patch and came shortly thereafter to the home of Samantha Bush, his former spouse, which was situated just beyond the soybean patch. There he procured a .22 rifle, a weapon he presumably owned, and returned to an uncultivated field across the creek from the White house, located at a higher elevation than the house. He then sat down on a hilltop with the rifle across his lap, awaiting further developments.

Martin T. Henson soon came back armed with a .22 rifle, accompanied by Willie Neace, a foster brother, who carried a shotgun. These two persons did not tarry long at the White home; for, in about fifteen minutes, they left for their home. Not long after they took their leave, appellant, along with Dewey Henson, who was another boarder of the White's, and Willie Neace came up the road in a truck and got out in the front yard of the White's. Appellant had been apprised of the heated words that had passed between Abbie Bush and his mother and younger brother. Willie Neace, who still had the shotgun in his possession, pointed out to appellant where Abbie Bush sat upon the hill. Appellant demanded that Willie Neace give him the shotgun but this request was refused. Appellant then grabbed for it and, after a brief tussle, obtained it and promptly shot Abbie Bush. Alpha Bush was asked what her father did when appellant shot him. She answered: "He kindly fell over." Alpha Bush testified that her father did not shoot at appellant, yet she does admit that there was a bullet hole in the front door of the White home after her father was killed.

Appellant testified that when he, Dewey Henson and Willie Neace alighted from the truck, Alpha Bush shouted to him, "Look out, Daddy is going to shoot you in the back." He said he ran around the house and was fired upon as he did so. Reaching the back, he entered the house through a rear door and walked through it to the front door. He claimed, while standing near this door, Abbie Bush shot at him a second time, hitting the door with a .22 rifle bullet. According to appellant, he then seized a shotgun that was placed at the side of this entrance and fired in the direction of Abbie Bush. At that moment Abbie Bush was in the act of firing again, appellant testified. Appellant said the distance from the place where appellant was standing when he fired from the door of the home of the White's to the spot where deceased was shot was "ninety-five yards and one foot." There was testimony to the effect that this distance was actually determined by measurement. He also said that Abbie Bush was on higher ground than he was when he fired the shotgun. Ruby White, the woman with whom Abbie Bush boarded, testified on behalf of appellant and substantially corroborated his ver-

sion of the occurrence. A character witness said Abbie Bush had the reputation of being a man of violence.

When the investigating authorities arrived, they found Abbie Bush lying upon the hillside slumped over a .22 rifle and leaning downhill. Sheriff Carl Bach testified that in his judgment the gun had not been discharged. Harlis Pitts, a policeman from the City of Jackson, stated that the gun had not been fired in the last year or two. The funeral director testified he removed Abbie Bush from the mountainside and that there was a rifle underneath the dead man's body; that the gun had a shell in the barrel but he did not think it had been fired; that Abbie Bush clutched in his hand four or five .22 cartridges; that there was a wound three inches above the left nipple about the size of a quarter; that he probed the wound to get the range after it entered the body and the range was to the right and slightly down. He stated: "It hit the backbone and ricocheted and went slightly to the right." He thought it came out in the right lung. He added that the wadding of the shotgun shell and the whole end of the shell entered the body of Abbie Bush.

In undertaking to establish that the verdict returned by the jury was against the evidence and the law, the hypothesis is advanced that it would have been impossible under the proven facts for appellant to have fired the fatal shot. It is pointed out the funeral director testified that the load, made up of part of the wadding and the shell, which entered Abbie Bush's body, made a hole about the size of a quarter and ranged downward in its course; and it is argued that this combination of circumstances could not have occurred because Abbie Bush was too far from the White home and uphill besides at the time appellant fired at him, with the result that the shotgun load would have scattered and the pellets would have gone upward not downward in his body.

A simple answer to this contention is that appellant frankly and freely admitted he fired the weapon at Abbie Bush, saying: "I didn't know that I had killed him." He also said Abbie Bush did not fire another shot after he discharged the shotgun at him. Then, too, the clear inference to be drawn from all the eyewitnesses to the crime is that appellant shot and killed Abbie Bush. His daughter, Alpha Bush, testified her father "kindly fell over" after appellant fired the shotgun at him. Another significant point is that appellant's plea at the trial was apparently not a denial of the act; rather, most of his efforts to obtain vindication of the bloody deed were concentrated on establishing that he acted in self-defense. In view of this line of testimony, we conclude it is unnecessary to attempt to explain any inconsistencies that cropped out in the evidence. The jury could reasonably conclude from the facts mentioned that appellant was guilty of the offense of which he was convicted.

Complaint is next made that Samantha Bush, a witness for the Commonwealth, was allowed to testify that Martin T. Henson upon his arrival back at the Henson home stated that his mother, Hazel Henson, had * * * "told him to come back and get the gun and come back and kill Red Bush." Shortly after this witness testified, the Commonwealth's attorney went into the jury room and returned with the weapon used in slaying Abbie Bush and made this comment in open court: "This is the gun Abbie Bush was killed with." Appellant objected to the first statement on the theory that it was made out of his presence and was highly damaging to his case in its effect on the jury. He objected to the second statement because he believed it was a self-serving declaration which the Commonwealth's attorney wrongfully injected into the trial in violation of his substantial rights. The first objection was sustained and the second was overruled, appellant reserving an exception. Appellant now maintains that a mo-

tion made to discharge the jury, in each instance, should have been sustained.

We are unable to understand how the first statement undermined appellant's case. The language attributed to Martin T. Henson applied solely to a mission he was supposed to undertake. Such evidence was patently incompetent, and the lower court so ruled, but it is readily apparent it had no bearing on the charge preferred against appellant and for which he stood trial. As to the remark made by the Commonwealth's attorney, it did nothing more than mention a fact that had previously been proven. There was never any question about the identity of the deadly weapon that appellant employed in the commission of the crime.

Wherefore, the judgment is affirmed.